# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| ALAN TATE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:13-cv-00047-JAW |
| | ) | |
| D.B., et al, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING DEFENDANT TODD BLANCHARD'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING PLAINTIFF ALAN TATE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

On a slushy winter day in February 2010, D.B., a minor, skiing at Mount Cranmore Ski Resort, struck and injured Alan Tate, a ski patrol member at the Resort, while D.B. was approaching the ski lift line at the base of the mountain. D.B.'s father, Todd Blanchard, was skiing about thirty to forty yards behind his son when the accident took place. Mr. Tate, who suffered serious injuries, brought this suit against D.B., alleging negligence, and against Mr. Blanchard, alleging negligent supervision. Before the Court is Mr. Tate's Motion for Summary Judgment as to the negligence count against D.B. and Mr. Blanchard's Motion for Summary Judgment as to the negligent supervision count. Because the summary judgment record reveals genuine disputes of material fact as to whether D.B. was negligent, the Court denies Mr. Tate's motion. The Court grants Mr. Blanchard's motion because Mr. Tate has not generated a genuine dispute of material fact as to

whether D.B. had dangerous propensities, an essential element of negligent supervision.

## I.     LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A fact is "material" if it "has the potential to change the outcome of the suit." *Tropigas de Puerto Rico, Inc v. Certain Underwriters at Lloyd's of London.*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010)).  An issue is genuine if "a reasonable jury could resolve the point in favor of the nonmoving party." *Tropigas*, 637 F.3d at 56 (quoting *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

Once this evidence is supplied by the moving party, the non-movant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (internal quotations and citations omitted); *see also* FED. R. CIV. P. 56(e).  In other words, the non-moving party must "present 'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993)).  The Court then "views the facts and draws all reasonable inferences in favor of the nonmoving party." *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011).   However, it

"afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)).

Where the parties file cross-motions for summary judgment, as they did here, the Court "must consider each motion separately, drawing all inferences in favor of each non-moving party in turn." *D & H Therapy Associates, LLC v. Boston Mut. Life Ins. Co.*, 640 F.3d 27, 34 (1st Cir. 2011).

## II. FACTS

### A. Procedural Posture

Mr. Tate filed the Complaint in this case on February 12, 2013, *Compl.* (ECF No. 1), and the Defendants answered on March 6, 2013. *Answer* (ECF No. 8). Count I of the Complaint alleged negligence by D.B., *Compl.* ¶¶ 6-15, and Count II alleged negligent supervision by Mr. Blanchard. *Compl.* ¶¶ 16-24. The parties commenced discovery, and the Court held a pre-filing conference under District of Maine Local Rule 56(h) on September 27, 2013. *Minute Entry* (ECF No. 29).

On October 11, 2013, the Defendants jointly moved for summary judgment as to Count II only. *Mot. for Summ. J.* (ECF No. 34) (*Def.'s Mot.*). Mr. Blanchard filed with this motion the required statement of material facts, *Def. Todd Blanchard's Statement of Material Facts* (ECF No. 35) (DSMF), and seven exhibits. On the same day, Mr. Tate filed a motion for summary judgment "for liability only" on Count I. *Mot. of Pl. for Summ. J. for Liability Only* (ECF No. 36) (*Pl.'s Mot.*). Mr. Tate also

submitted a statement of material facts, *Pl.'s Statement of Material Facts* (ECF No. 37) (PSMF), accompanied with eight exhibits.

On November 1, 2013, both Defendants filed their joint opposition to Mr. Tate's motion, *Def.'s Opp'n to Pl.'s Mot. for Summ. J.* (ECF No. 50) (*Def.'s Opp'n*), along with a reply to Mr. Tate's Statement of Material Facts and a Statement of Additional Material Facts. *Def.'s Opposing Statement of Material Facts* (ECF No. 51). Three additional exhibits accompanied these reply statements. On the same day, Mr. Tate filed his opposition to the Defendants' Motion for Summary Judgment as to Count II, *Pl.'s Opp'n to Def. Todd Blanchard's Mot. for Summ. J.* (ECF No. 52) (*Pl.'s Opp'n*), his reply statement of material facts, and his statement of additional material facts. *Pl.'s Statement of Material Facts in Opp'n* (ECF No. 53) (PRDSMF) (PSAMF). Mr. Tate filed two additional exhibits with his reply statement. Finally, on November 15, Mr. Blanchard filed a reply to Mr. Tate's opposition to the Defendants' motion. *Def. Todd Blanchard's Reply in Support of His Mot. for Summ. J.* (ECF No. 55) (*Def.'s Reply*). Neither party replied to the other party's statement of additional material facts. Mr. Tate did not reply to the Defendants' opposition to his motion.

### B.    Summary Judgment Facts

#### 1.    Uncontested Facts

On February 20, 2010, D.B. and his father Mr. Todd Blanchard were involved in a skiing accident at Mt. Cranmore Ski Resort in North Conway, New Hampshire. DSMF ¶ 1; PRDSMF ¶ 1. On the day of the accident, Mr. Blanchard, D.B., Paul Cote, Nick Cote, and Michael Cote were skiing together. DSMF ¶ 28; PRDSMF ¶

28.  Mr. Tate alleges that he suffered personal injuries as a result of the accident. DSMF ¶ 2; PRDSMF ¶ 2.  He alleges that D.B. was negligent in failing to "maintain control of his speed and course at all times" and "heed posted warnings."  DSMF ¶ 3; PRDSMF ¶ 3.

Mr. Tate further alleges that Mr. Blanchard, the father and legal guardian of D.B., was negligent in his supervision of D.B.  DSMF ¶ 4; PRDSMF ¶ 4.  He alleges that D.B. "had, at the time of the accident, the dangerous propensity to ski in a manner that creates risk of a collision with other skiers."  DSMF ¶ 5; PRDSMF ¶ 5. He alleges that Mr. Blanchard knew or should have known of D.B.'s alleged dangerous propensity.  DSMF ¶ 6; PRDSMF ¶ 6.  Mr. Tate alleges that Mr. Blanchard "had the opportunity and the ability to control D.B.'s behavior at the time of the collision with [Mr. Blanchard]."  DSMF ¶ 7; PRDSMF ¶ 7.

The Complaint in this case was served on the Defendants on February 15, 2013.  DSMF ¶ 8; PRDSMF ¶ 8.  The Defendants filed a timely answer.  DSMF  ¶ 9; PRDSMF ¶ 9.

D.B. participated in snowboarding from age of 5 until age 10, at which time he began skiing.  DSMF ¶ 10; PRDSMF ¶ 10.  D.B. was a member of his school ski team in 2009-2010 and skied at least three times per week.  DSMF ¶ 11; PRDSMF ¶ 11.  At the time of the accident, D.B. testified that his ski ability level was close to expert, meaning that he could ski any trail and any terrain without hurting himself, up to and including "black diamond" trails.  DSMF ¶ 12; PRDSMF ¶ 12; PSMF ¶ 10;

DRPSMF ¶ 10.[1]  Prior to the date of the accident, D.B. had skied "single diamond" trails and "blue square" trails.  DSMF ¶ 26; PRDSMF ¶ 26.  As a member of his school ski team, D.B. had participated in slalom and "GS" racing for two to three years prior to the accident.  DSMF ¶ 15; PRDSMF ¶ 15.  D.B. testified that he would practice ski racing three to four times per week in middle school and six days per week in high school.  PSAMF ¶ 5.  He testified that he has collided with ski racing poles many times, at least once per practice, and has fallen and been injured, at least once per practice.  PSAMF ¶ 4.

D.B. did not consume any alcohol or drugs in the twenty-four hour period before the accident.  DSAMF ¶ 21.  He was not using headphones or a cell phone at the time of the accident.  DSAMF ¶ 22.  The group including Mr. Blanchard and D.B. had skied approximately five runs down the mountain on the day of the accident.  DSMF ¶ 29; PRDSMF ¶ 29.  D.B. testified that on the day of the accident he was able to make controlled turns and control his rate of speed.  DSMF ¶ 13; PRDSMF ¶ 13.  He also testified that he was able to stop himself, including making sudden stops, despite slushy conditions.  DSMF ¶ 14; PRDSMF ¶ 14.

Mr. Blanchard testified that it was a fairly busy day, and that the collision occurred a hundred feet from the lift lines at the base of the mountain.  PSAMF ¶ 7. The area where the collision occurred was marked as a "slow ski area" and D.B.

---

[1]     Skiing mountains typically designate ski trails with one of four designations: (1) green circles for easier, (2) blue squares for intermediate, (3) black diamonds for more difficult, and (4) double black diamonds for most difficult.  According to the Mt. Cranmore Ski Resort trail map, the Mountain classifies its ski trails into three categories: (1) a green circle for easier, (2) a blue square for more difficult, and (3) a black diamond for "most difficult." PSMF Attach. 4 (ECF No. 37) (*Cranmore Map*).  Mt. Cranmore does not designate any trails with a double black diamond.

passed the slow skiing sign approximately five times that day prior to the collision. PSMF ¶¶ 3-4; DRPSMF ¶¶ 3-4; PSAMF ¶ 1.  Mr. Blanchard was skiing thirty to forty feet behind D.B. at the time of the collision.  DSMF ¶ 30; PRDSMF ¶ 30; PSAMF ¶ 7.  Mr. Blanchard did not attempt to slow D.B.'s speed at any time prior to the accident.  DSMF ¶ 32; PRDSMF ¶ 32.  He did not witness the accident because he was looking at the terrain twenty feet in front of him, and in fact did not see Mr. Tate at all prior to the accident with D.B.  DSMF ¶¶ 33-34; PRDSMF ¶ 33-34.

Mr. Tate was a member of the Ski Patrol at Cranmore Mountain and had been on duty since approximately 7 A.M. on the day of the accident.  PSMF ¶ 2; DRPSMF ¶ 2.  He was wearing a red jacket with white crosses on it.  PSMF ¶ 13; DRPSMF ¶ 13.  At the time of the accident, Mr. Tate was "polling" toward the lift area at the base of Cranmore Mountain.  PSMF ¶ 1; DRPSMF ¶ 1.  D.B. crashed into Mr. Tate.  PSMF ¶ 11; DRPSMF ¶ 11.

D.B. admitted that he was looking straight ahead at the time of the collision, but he did not see Mr. Tate before he struck him.  PSMF ¶ 12; DRPSMF ¶ 12; PSAMF ¶ 2.  D.B. testified that he struck Mr. Tate with enough force and/or speed to knock both himself and Mr. Tate to the ground, bruise the left side of D.B.'s face (while both he and Mr. Tate were wearing a helmet), cause him to be dazed and possibly lose consciousness.  PSAMF ¶ 9; DSAMF ¶ 20.  Mr. Blanchard testified that both D.B. and Mr. Tate were thrown five feet from the point of impact, and that he observed Mr. Tate to have a cut on the bridge of his nose.  PSAMF ¶¶ 10-11.

Mr. Tate suffered multiple facial fractures and residual neurological problems. PSMF ¶ 19; DRPSMF ¶ 19.

Mr. Tate never saw D.B. prior to the accident, and has no personal knowledge of what D.B. was doing prior to the accident. DSMF ¶ 50; PRDSMF ¶ 50; DSAMF ¶ 24. Mr. Tate could not explain why he did not see D.B. prior to the collision, other than to say that he must have come from an angle that he did not see. DSAMF ¶ 25. Patrick Maloney, a Mt. Cranmore ski school instructor, witnessed the accident and reported to ski patrol that "the boy lost control [and] hit [Mr. Tate] broadside from above." DSMF ¶ 51; PRDSMF ¶ 51; PSMF ¶ 17; DRPSMF ¶ 17; DSAMF ¶ 23.

It is D.B.'s responsibility to ski slowly in a marked "slow" ski area, and it was D.B.'s usual practice to follow this rule. PSMF ¶¶ 5-6; DRPSMF ¶¶ 5-6. D.B. was the uphill skier and Mr. Tate was the downhill skier. PSMF ¶ 7; DRPSMF ¶ 7. D.B. testified that he was familiar with the Skier's Responsibility Code because his ski racing coach taught it to him. PSMF ¶ 8; DRPSMF ¶ 8. The Code includes that it is the skier's responsibility to ski in control, that the people ahead of the skier have the right of way, and that it is the skier's responsibility to avoid them. PSMF ¶ 8; DRPSMF ¶ 8. D.B. acknowledged that he had the responsibility to yield to downhill skiers and that he had the responsibility to avoid hitting Mr. Tate. PSMF ¶¶ 9, 15; DRPSMF ¶¶ 9; 15.

D.B. did not receive any warnings or revocations of his ticket either before or as a result of the accident with Mr. Tate. DSMF ¶ 17; PRDSMF ¶ 17. D.B. has never been involved in any other skiing or snowboarding accident in which he

collided with another person, has never received a warning for excessive speed or reckless skiing from ski patrol or any mountain employee, and has never had his ticket revoked due to excessive speed or reckless skiing. DSMF ¶¶ 18-20; PRDSMF ¶¶ 18-20. Furthermore, Mr. Blanchard has no knowledge of any such occurrences. DSMF ¶¶ 35-38; PRDSMF ¶¶ 35-38. D.B.'s ski coach has never disciplined him for reckless skiing or excessive speed. DSMF ¶ 21; PRDSMF ¶ 21. Mr. Blanchard has never had occasion to reprimand or discipline D.B. for reckless skiing or excessive speed, and has never actually done so. DSMF ¶¶ 22, 39; PRDSMF ¶¶ 22, 39.

Mr. Blanchard testified that he has been skiing for more than thirty years. DSMF ¶ 23; PRDSMF ¶ 23. He "helped out D.B.'s middle school ski team" as a parent volunteer during races and practices, roughly three times each week. DSMF ¶ 24; PRDSMF ¶ 24; PSAMF ¶ 6. Mr. Blanchard testified that his ski ability level was intermediate at the time of the accident, while D.B.'s ability was close to expert, meaning that D.B. could "pretty much ski any condition, pretty much any trail that is available to him." DSMF ¶ 25; PRDSMF ¶ 25; PSMF ¶ 10; DRPSMF ¶ 10. To Mr. Blanchard's knowledge, D.B. was able to make controlled turns, control his rate of speed, and make sudden stops on the day of the accident. DSMF ¶ 27; PRDSMF ¶ 27.

Patricia Blanchard testified that she believed D.B. had the ability to make sudden stops and control his speed at the time of the accident. DSMF ¶ 41; PRDSMF ¶ 41. She has no knowledge of D.B. having ever been involved in any other skiing or snowboarding accidents. DSMF ¶ 42; PRDSMF ¶ 42. She has no

knowledge of D.B. having ever received a warning for excessive speed or having his ticket revoked for high speed or reckless skiing. DSMF ¶ 43; PRDSMF ¶ 43.

Nicholas Cote testified that D.B. was, at the time of the accident, an "advanced or better" skier who had the ability to make controlled stops and control his speed. DSMF ¶ 44; PRDSMF ¶ 44. He has no knowledge of D.B. having ever been involved in any other skiing or snowboarding accidents. DSMF ¶ 45; PRDSMF ¶ 45. He has no knowledge of D.B. having ever been warned or having his ticket revoked, or being asked to leave the mountain for excessive speed or reckless skiing. DSMF ¶ 46; PRDSMF ¶ 46. Nicholas Cote testified that at no time during the day of the accident did he race with D.B. DSMF ¶ 47; PRDSMF ¶ 47.

Paul Cote has no knowledge of D.B. having ever been involved in any other skiing or snowboarding accidents. DSMF ¶ 48; PRDSMF ¶ 48. He has no knowledge of D.B. having ever been warned or having his ticket revoked or being asked to leave any mountain for excessive speed or reckless skiing. DSMF ¶ 49; PRDSMF ¶ 49.

## 2. Contested Facts in the Light Most Favorable to the Defendants

Mr. Blanchard testified that, prior to the accident, he, D.B., and Michael Cote were skiing at fifteen to twenty miles per hour on the trail due to the trail conditions. DSMF ¶ 40; PRDSMF ¶ 40. Mr. Blanchard and D.B. were traveling at a "slow rate of exiting speed for a trail," between five and fifteen miles per hour, at the time of the accident. DSMF ¶¶ 16, 31; PRDSMF ¶¶ 16, 31; DSAMF ¶¶ 26-27.

The area where the accident occurred was clearly marked with a large "Slow" sign. PSMF ¶ 3; DRPSMF ¶ 3.[2] D.B. testified that he struck Mr. Tate with enough force and/or speed to knock both himself and Mr. Tate to the ground, bruise D.B.'s head (while wearing a helmet), cause him to be dazed and possibly lose consciousness. PSMF ¶ 14; DRPSMF ¶ 14.[3]

D.B. signed a written incident report, prepared by Christopher DiCrole, acknowledging that he "struck the other person who was skating across the base area." PSMF ¶ 16; DRPSMF ¶ 16.[4]

---

[2]    Mr. Tate's paragraph 3 asserts that "[t]he area is clearly marked with a large 'Slow' sign. PSMF ¶ 3 (citing *D.B. Dep. Tr.* at 24). The Defendants interpose a qualified response, suggesting that D.B. testified that "[a]n area 'quite a few feet ahead of' where the accident occurred was marked with a 'Slow' sign." DRPSMF ¶ 3 (citing *D.B. Dep. Tr.* at 24:24-25:7 and quoting *D.B. Dep. Tr.* at 25:3-4). While the Defendant's quotation is accurate, D.B. also testified that he could "see a slow sign in the area of the accident." *D.B. Dep. Tr.* at 24:24). Even viewing this testimony in a light most favorable to the Defendants, the Court concludes that "the area where the collision occurred" was marked with a slow sign. The Court deems Mr. Tate's paragraph 3 admitted under Local Rule 56(f), (g).

[3]    The Defendants interpose a qualified response to Mr. Tate's paragraph 14: "D.B. testified that the speed at which he was skiing was sufficient to himself be knocked down when he collided with Mr. Tate, who is larger than D.B. was at the time of the accident. D.B. testified that, even at a low speed, the mass he hit was enough to knock him to the ground." DRPSMF ¶ 14. While it is true that D.B. testified to this effect, this testimony does not render the assertion of Mr. Tate's paragraph 14 inaccurate or misleading. The Court deems Mr. Tate's paragraph 14 admitted under Local Rule 56(f), (g).

[4]    Mr. Tate's paragraph 16 states that "D.B. provided a written statement that he 'struck the other person who was skating across the base area.'" PSMF ¶ 16 (quoting PSMF Attach. 6 *Incident Report Form* (ECF No. 37) (Feb. 20, 2010) (*Incident Report Form*)). The Defendants interpose a qualified response, claiming that "D.B. testified that he signed the incident report; however, he did not complete any portion of the written description of the incident." DRPSMF ¶ 16 (without citation). Without reference to D.B.'s testimony, the Court cannot determine whether D.B. testified as the Defendants claim. The Incident Report Form itself indicates that the "name of [the] individual completing [the] report" was either "Christopher DiCrole" or "Christopher DiCrose." *Incident Report Form*. The Court adjusted Mr. Tate's paragraph 16 to indicate that Mr. DiCrole prepared the report and D.B. signed it, but otherwise deems the paragraph admitted under Local Rule 56(f), (g).

### 3. Contested Facts in the Light Most Favorable to Mr. Tate[5]

Mr. Blanchard testified that, prior to the accident, he, D.B., and Michael Cote were skiing at fifteen to twenty miles per hour on the trail due to the trail conditions. DSMF ¶ 40; PRDSMF ¶ 40.[6] Mr. Blanchard and D.B. were traveling at a "slow rate of exiting speed for a trail," between five and fifteen miles per hour, at the time of the accident. DSMF ¶¶ 16, 31; PRDSMF ¶¶ 16, 31; DSAMF ¶¶ 26-27.[7]

---

[5]     In Mr. Tate's paragraph 3, he claims that "D.B. testified that he has skied seventy to ninety miles per hour, in the past." PSAMF ¶ 3 (citing PSAMF Attach. 1 *Dep. of D.P.*, at 49 (June 21, 2013) (*D.B. Dep. Tr.*)). D.B. had the following exchange with the questioner:

> Q.     Well, in your mind what's the maximum speed in which you could possibly go?
> A.     Anywheres between 70 and 90 miles an hour.

*D.B. Dep. Tr.* at 49:5-7. Even drawing all reasonable inferences in favor of Mr. Tate, the Court does not conclude that D.B. testified that he had actually "skied seventy to ninety miles per hour"; his testimony was merely his own speculation regarding the maximum speed he might be able to achieve. The Court does not credit Mr. Tate's paragraph 3.

In his paragraph 18, Mr. Tate asserts that "Mr. Tate (also wearing a helmet) was struck in the face with such force that he was knocked unconscious." PSMF ¶ 18 (citing PSMF Attach. 7 *Report of Alan Tate* (undated)). The Defendants deny that Mr. Tate testified that he was knocked unconscious. DRPSMF ¶ 18. The unsigned, unsworn, typed material, allegedly prepared by Mr. Tate, is not competent summary judgment evidence. FED. R. CIV. P. 56(c)(1)(A); *see also* 28 U.S.C. § 1746; *In re World Trade Center Disaster Site Litig.*, 722 F.3d 483, 488 (2d Cir. 2013). As Mr. Tate does not direct the Court to any portion of his sworn deposition in which he adopted the Report, and does not otherwise support the assertion of paragraph 18 with citation to record material, the Court does not credit Mr. Tate's paragraph 18.

[6]     Mr. Tate interposes a qualified response to the Defendants' paragraph 40, PRDSMF ¶ 40 (citing PSAMF ¶¶ 10-11), but the additional facts of the qualification do not render paragraph 40 inaccurate or misleading. *See id.* The Court deems the Defendants' paragraph 40 admitted under Local Rule 56(f), (g).

[7]     Mr. Tate interposes a qualified response to the Defendants' paragraph 16: "D.B. also testified that he struck Mr. Tate with enough force and/or speed to knock both [himself] and Mr. Tate to the ground, bruise D.B.'s head (while both he and Mr. Tate were wearing a helmet), cause him to be dazed and possibly lose consciousness." PRDSMF ¶ 16 (citing PSAMF ¶ 9). He likewise interposes a qualified response to the Defendants' paragraph 31: "Todd Blanchard testified that both D.B. and Mr. Tate were thrown five feet from the point of impact. Todd Blanchard also testified he observed Mr. Tate to have a cut on the bridge of his nose." PRDSMF ¶ 31 (citing PSAMF ¶¶ 10-11). The Defendants do not deny these statements, and the Court credits them, but they do not render the assertions of the Defendants' paragraphs 16 and 31 inaccurate or misleading. The Court deems the Defendants' paragraphs 16 and 31 admitted under Local Rule 56(f), (g).

The area where the accident occurred was clearly marked with a large "Slow" sign. PSMF ¶ 3; DRPSMF ¶ 3. D.B. testified that he struck Mr. Tate with enough force and/or speed to knock both himself and Mr. Tate to the ground, bruise D.B.'s head (while wearing a helmet), cause him to be dazed and possibly lose consciousness. PSMF ¶ 14; DRPSMF ¶ 14.

D.B. provided a written statement acknowledging that he "struck the other person who was skating across the base area." PSMF ¶ 16; DRPSMF ¶ 16.

## III. THE POSITIONS OF THE PARTIES

### A. The Plaintiff's Motion

#### 1. Alan Tate's Argument

Mr. Tate cites a New Hampshire statute that he claims establishes a duty of care that D.B. violated:

> Each skier or passenger shall conduct himself or herself, within the limits of his or her own ability, maintain control of his or her speed and course at all times both on the ground and in the air, while skiing, snowboarding, snow tubing, and snowshoeing heed all posted warnings, and refrain from acting in a manner which may cause or contribute to the injury of himself, herself, or others.

*Pl.'s Mot.* at 3 (quoting N.H. REV. STAT. ANN. § 225-A:24(III)). He quotes a case from the Supreme Court of New Hampshire:

> A defendant may be held liable to the plaintiff for [unreasonably] creating or countenancing risks other than risks inherent in the sport, or for increasing inherent risks, and in any event will be held liable for reckless or intentional injurious conduct totally outside the range of ordinary activity involved in the sport, but liability should not place unreasonable burdens on the free and vigorous participation in the sport.

*Id.* at 4 (quoting *Allen v. Dover Co-Recreational Softball League*, 148 N.H. 407, 418, 807 A.2d 1274, 1285 (2002)).

Mr. Tate argues that D.B. acted outside the range of ordinary activity by skiing "at a high rate of speed in a clearly marked 'slow skiing area.'" *Id.* at 5. He further argues that because the accident occurred in the base are close to the lift lines, Mr. Tate should not have expected to encounter another skier traveling "at a high rate of speed." *Id.*

### 2. The Defendants' Response

The Defendants argue that a skiing collision does not always result from negligence by one of the parties. *Def.'s Opp'n* at 4. They cite federal and state cases from outside New Hampshire for the proposition that the mere fact of a skiing accident, without evidence of a breach of duty by the defendant, does not establish negligence. *Id.* at 4-5 (citing *Dillworth v. Gambardella*, 970 F.2d 1113, 1114 (2d Cir. 1992); *LaVine v. Clear Creek Skiing Corp.*, 557 F.2d 730, 735 (10th Cir. 1977); *Green v. Sherburne Corp.*, 137 Vt. 310, 311-13, 403 A.2d 278, 280 (1979); *Novak v. Vierene*, 586 N.E.2d 578, 580 (Ill. App. Ct. 1991); *Gray v. Houlton*, 671 P.2d 443, 444 (Colo. Ct. App. 1983); and others). The Defendants contend that unavoidable accidents are one of the inherent risks of skiing that skiers assume when they take to the slopes, *id.* at 5-6, and further point out that whether a particular collision is an inherent risk is a fact question properly submitted to the jury. *Id.* at 6 (quoting *Dillworth*, 970 F.2d at 1123).

On the facts of this case, the Defendants argue that Mr. Tate has not put forth facts that show, as a matter of law, that D.B. breached a duty owed to Mr. Tate. *Id.* at 7. They characterize Patrick Maloney's written statement as describing D.B. as "suddenly and inexplicably" losing control, *id.* at 7, and point out

that Mr. Maloney's statement does not make any assertion at all about D.B.'s speed at the time of the accident. *Id.* at 3. They surmise that had D.B. been skiing recklessly or out of the range of ordinary activity, Mr. Maloney would have noted that in his report. *Id.* at 3-4. The Defendants conclude that there is an outstanding issue of fact as to whether D.B. was exercising due care when the accident occurred; if he was, he would not be liable for negligence. *Id.* at 7-8.

### B.    Todd Blanchard's Motion

#### 1.    Todd Blanchard's Argument

Mr. Blanchard argues first that the Supreme Court of New Hampshire has not yet recognized the tort of negligent supervision. *Def.'s Mot.* at 3-6. He points out that the three decisions of the New Hampshire Supreme Court addressing the tort have all found insufficient facts to make out its elements, as they might become actionable. *Id.* (citing *Clark v. McKerley*, 126 N.H. 778, 779-80, 497 A.2d 846, 847 (1985); *Towle v. Kiman*, 134 N.H. 263, 265, 591 A.2d 911, 912 (1991); and *Langlois v. Promerleau*, 143 N.H. 456, 569, 726 A.2d 1285, 1287 (1999)). The lone Superior Court decision acknowledging the existence of the tort, *Roy ex rel Roy v. Currier*, No. 01-C-83, 2001 WL 344013574, at *3 (N.H. Super. Oct. 15, 2001) (unreported), permitted a negligent supervision action to survive dismissal where a couple taking care of their nephew's young daughter was alleged to have repeatedly left her in the care of their minor son, who was known to have exposed himself to the girl in a sexual manner. Mr. Blanchard contends that the facts of *Currier* only supported negligent supervision because the behavior of the defendants was "socially unreasonable." *Id.* at 6.

Next, Mr. Blanchard argues that even if New Hampshire did recognize negligent supervision, the facts of this case would not make out the elements of the tort. *Id.* at 6-12. In particular, he maintains that the two predicate elements—a dangerous propensity in the child and the parent's knowledge of that propensity—are not met here. *Id.* at 7-10. He points out that D.B. had no history of dangerous skiing, that D.B. was a nearly-expert skier, and that D.B. consistently conducted himself properly on the ski slopes. *Id.* Mr. Blanchard also points out that no record evidence shows that he had any knowledge of any such dangerous propensity or any need to exercise control over D.B. at the time of the accident. *Id.* at 10-12.

### 2. Alan Tate's Response

Mr. Tate replies that although the Supreme Court of New Hampshire has not adopted the tort of negligent supervision, it also has not rejected it, and the New Hampshire Superior Court has expressed its opinion that the New Hampshire Supreme Court would adopt it under the right circumstances. *Pl.'s Opp'n* at 3. He further argues that D.B. did have a dangerous propensity because the area near the crash was marked with "slow skiing" signs, D.B. had seen these signs, D.B. was looking straight ahead at the time of the accident, and he did not see Mr. Tate. *Id.* at 3-4. He further argues that D.B. has skied seventy to ninety miles per hour in the past,[8] had collided with race poles many times, and had fallen and been injured regularly. *Id.* at 4. As further evidence of D.B.'s dangerous propensity, Mr. Tate

---

[8]     The Court does not credit this fact. *Supra* note 5 (discussing PSAMF ¶ 3).

offers the facts that D.B. testified that he would practice ski racing three to four times per week in middle school and six days per week in high school. *Id.*

Mr. Tate next argues that Mr. Blanchard knew or should have known of D.B.'s dangerous propensity. This is so, he urges, because Mr. Blanchard was a parent volunteer for his son's ski racing team and had seen D.B. crash into poles while racing. *Id.* He recites details from the crash itself; for instance, that Mr. Blanchard was skiing near to D.B. and had the opportunity to call out to him. *Id.* He concludes that "Todd Blanchard reasonably should have instructed his son to use caution." *Id.* at 4-5.

Finally, Mr. Tate argues that this situation is "akin to the doctrine of *res ipsa loquitor* where the accident is of a kind which ordinarily does not occur in the absence of negligent conduct." *Id.* at 5.

### 3.    **Todd Blanchard's Reply**

Mr. Blanchard first points out that the Supreme Court of New Hampshire has rejected negligent supervision claims on facts demonstrating far more culpability than those in this case. *Def.'s Reply* at 1-2. Next, he points out that in New Hampshire pattern jury instructions on negligent supervision, there is a prominent caveat that the Supreme Court has not actually adopted the tort. *Id.* at 3. Mr. Blanchard denies that the facts of the accident itself show a dangerous propensity in D.B.; rather, he argues, the facts show that D.B. was a good skier who had not gotten into trouble before. *Id.* at 3-5. For instance, he disagrees that D.B.'s numerous collisions with ski racing poles during race events show a dangerous propensity, since professional ski racers routinely and consistently come in contact

with racing poles, and the poles are designed to be impacted. *Id.* at 5. Finally, Mr. Blanchard disagrees with Mr. Tate's contention that the events of the accident itself show that Mr. Blanchard knew or should have known about D.B.'s alleged dangerous propensity. *Id.* at 5-6.

## IV. DISCUSSION

### A. Choice of Law

The alleged negligent acts occurred in New Hampshire, but this Court sits in the District of Maine and both Defendants live in Maine. *Compl.* ¶¶ 4-5. In theory, this presents a choice of law problem. However, the parties apparently agree that New Hampshire law controls the Defendants' liability under both Count I and Count II. *See Def.'s Mot.*; *Pl.'s Mot.*[9] The Court applies the choice of law rules of its host state, *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941), and Maine uses the "most significant contacts and relationships" test set out in the Restatement (Second) of Conflict of Laws. *Adams v. Buffalo Forge Co.*, 443 A.2d 932, 934 (Me. 1982). The Court accepts the parties' choice of law position for purposes of these motions in this case.

### B. Alan Tate's Motion: D.B.'s Negligence

To recover for basic negligence under New Hampshire law, a plaintiff must show: (1) that the defendant owes the plaintiff a duty; (2) that the defendant breached that duty; and (3) that the breach proximately caused harm to the

---

[9]    Neither party addresses the choice of law issue, but each cited only New Hampshire state law as controlling.

plaintiff. *Pesaturo v. Kinne*, 161 N.H. 550, 557, 20 A.3d 284, 290 (2011); *Dupont v. Aavid Thermal Techs., Inc.*, 147 N.H. 706, 709, 798 A.2d 587, 590 (2002).[10]

Ordinarily, the first element of a negligence case is the duty of care. Every person owes every other person a duty to take "due care under all the circumstances of the particular case." *Garland v. Boston & M.R.R.*, 76 N.H. 556, 86 A. 141, 141 (1913). As noted, New Hampshire statutory law mandates that:

> [e]ach skier . . . shall conduct himself . . . , within the limits of his . . . own ability, maintain control of his . . . speed and course at all times both on the ground and in the air, while skiing . . . heed all posted warnings, and refrain from acting in a manner which may cause or contribute to the injury of himself . . . or others.

N.H. REV. STAT. ANN. § 225-A:24(III). This statute creates a generalized duty on the part of each skier to use due care not to injure other skiers and, more specifically, confirms that D.B. owed that duty of care to Alan Tate in February 2010.

The Court turns to the second element of negligence—whether Mr. Tate has established there is no genuine dispute of material fact as to whether D.B. breached that duty. Here, Mr. Tate's motion falters. New Hampshire law has long held that

---

[10]     Several recent decisions of the New Hampshire Supreme Court phrase the duty element by asking whether "there exists a duty" without explicitly requiring that the duty be owed by the defendant to the plaintiff. *E.g.*, *Pesaturo*, 161 N.H. at 557, 20 A.3d at 290; *DeWyngaerdt v. Bean Ins. Agency, Inc.*, 151 N.H. 406, 407, 855 A.2d 1267, 1269 (2004). This is the formulation that Mr. Tate offers. *Pl.'s Mot.* at 3. In *Aavid Thermal*, however, the New Hampshire Supreme Court specified that the duty must be owed by the defendant to the plaintiff. 147 N.H. at 709, 798 A.2d at 590 ("[T]he plaintiff must show that . . . [the defendants] owed the decedent a duty"); *see also Hickingbotham v. Burke*, 140 N.H. 28, 34, 662 A.2d 297, 301 (1995) ("[T]he plaintiff must demonstrate the existence of a duty flowing from the defendant to the plaintiff"); *Cote v. Litawa*, 96 N.H. 174, 176-77, 71 A.2d 792, 794-95 (1950) ("Although there is some authority for the proposition that one owes a duty to the world at large to refrain from conduct creating an unreasonable risk of injury to others . . . we are of the opinion, that in actions for failure to use ordinary care, a duty toward the complaining party must be shown to exist"). This Court agrees with the formulation in *Aavid Thermal*, *Hickingbotham*, and *Cote*. The duty alleged to have been breached must be one owed by the defendant to the plaintiff, not a free-floating duty to no one in particular.

"the mere fact of injury does not indicate negligence on the part of anyone." *Smith v. Coca Cola Bottling Co.*, 97 N.H. 522, 524, 92 A.2d 658, 659 (1952). Similarly, the fact that D.B. collided with Alan Tate on a ski slope does not necessarily mean he was negligent.

In other words, to define the line between skiing collisions caused because a skier was negligent and those caused because of the risks inherent in the sport is a matter of fact, not law. Here, the facts, especially when viewed in the light most favorable to D.B., compel jury resolution as to why this accident happened. As the Second Circuit wrote in *Dillworth*, "[n]umerous authorities agree collisions between skiers may occur despite the exercise of due care by the parties." 970 F.2d at 1122 (citing cases). On this record, the Court concludes that "whether the collision that occurred between the parties was an inherent danger obvious and necessary to participation in the sport of skiing is a question of fact properly submitted to the jury." *Id.* at 1123. This conclusion does not imply that Mr. Tate will or will not be able to convince a jury that D.B. was negligent by colliding with him, only that on these facts, viewed in the light most favorable to D.B., there is a jury question as to D.B.'s negligence.

### C. Todd Blanchard's Motion: Negligent Supervision

The Supreme Court of New Hampshire has not formally recognized the tort of negligent supervision. *Langlois*, 143 N.H. at 459, 726 A.2d at 1287 ("To date, we have declined to recognize the tort of negligent supervision to hold parents liable for the acts of their children, . . . especially in the absence of parental knowledge of the child's dangerous propensities"); 134 N.H. at 265, *Towle*, 591 A.2d at 912; *Clark*,

126 N.H. at 779-80, 497 A.2d at 847. As *Langlois* suggests, however, if New Hampshire were to adopt the tort of negligent supervision, it would require, as a predicate, that the child possess a dangerous propensity of which the defendant parent knew or should have known. *E.g.*, *Langlois*, 143 N.H. at 459-60, 726 A.2d at 1288. Furthermore, if the tort were to be recognized, it would only expose a parent to liability for conduct that is "'socially unreasonable.'" *Currier*, 2001 WL 34013574, at *3 (quoting *Towle*, 134 N.H. at 265, 591 A.2d at 911 (quoting WILLIAM LLOYD PROSSER & W. PAGE KEETON, PROSSER AND KEETON ON TORTS § 1, at 6 (5th ed. 1984))).

Even viewing the facts in the light most favorably to Mr. Tate, the summary judgment record does not reveal any evidence that D.B. had a "dangerous propensity" on the ski slopes. The record reflects that in February 2010, D.B. was an experienced skier who practiced with his school ski teams regularly; he knew and appreciated the code of conduct expected of skiers; he had never had a collision with another skier; and he had never been reprimanded or otherwise disciplined for reckless skiing. His routine impacts during ski team practice with ski racing poles and his occasional falls on the slopes are unremarkable and do not demonstrate a dangerous propensity. Contrary to Mr. Tate's suggestion, the mere fact that D.B. participated in the organized sport of ski racing with his high school team does not establish that he had a "dangerous propensity." Whatever his conduct at the time of the accident, it cannot, as a matter of law, establish a dangerous propensity before the accident without a link to prior similar conduct. In short, even viewing

this evidence in the light most favorable to Mr. Tate, there is a paucity of evidence from which a reasonable jury could find that D.B. had a dangerous propensity. Because D.B. had no dangerous propensity, there is no basis to hold his father liable for negligent supervision.[11]

## V. CONCLUSION

The Court GRANTS the Defendants' Motion for Summary Judgment as to Count II (ECF No. 34) and DENIES the Plaintiff's Motion for Summary Judgment on Liability as to Count I (ECF No. 36).

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 10th day of February, 2014

---

[11] Mr. Tate also suggests that this accident is "akin to the doctrine of *res ipsa loquitor*," which might independently entitle Count II to survive summary judgment. *Pl.'s Opp'n* at 5 (citing *Smith*, 97 N.H. 522, 522-25, 92 A.2d at 658-60). One essential element of *res ipsa* is that "the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence." *Smith*, 97 N.H. at 524, 92 A.2d at 659. However, the sport of skiing by its nature results in accidents that occur in the absence of someone's negligence, and the record does not justify the conclusion that D.B. had to have been negligent to have caused the collision with Mr. Tate. *See Dillworth*, 970 F.2d at 1122 (collecting cases). As the *Smith* Court itself stated, "[t]his doctrine [of *res ipsa loquitor*] does not do away with the well established rules of law that a person asserting negligence has the burden of proof and that the mere fact of injury does not indicate negligence on the part of anyone." *Smith*, 97 N.H. at 524, 92 A.2d at 659.